**Harold DONNEGAN, Appellant–Petitioner,**

v.

**STATE of Indiana, Appellee–Respondent.**

**No. 79A02–0711–PC–986.**

Court of Appeals of Indiana.

July 15, 2008.

Transfer Denied Sept. 18, 2008.

Hilary Bowe Ricks, Indianapolis, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Justin F. Roebel, Deputy Attorney General, Indianapolis, IN, Attorneys For Appellee.

## OPINION

DARDEN, Judge.

### STATEMENT OF THE CASE

Harold Donnegan appeals from the denial of his petition for post-conviction relief.

We affirm.

### ISSUES

1. Whether Donnegan received ineffective assistance of appellate counsel.

2. Whether the prosecutor committed misconduct.

### FACTS

We adopt the statement of facts set forth in this court's decision in *Donnegan v. State*, 809 N.E.2d 966 (Ind.Ct.App.2004), *trans. denied*, which reads as follows:

> Pursuant to an ongoing drug investigation, on the morning of March 27, 2001, Tippecanoe County Drug Task Force Officers took four bags of trash from the residence at 910 Eastwich Drive in Lafayette, where Donnegan

and Angelia Hill were believed to be living. In the trash, officers found, among other things, marijuana seeds and residue, cocaine residue, and plastic baggie remnants.

The next day, March 28, 2001, officers obtained a search warrant for the residence at 910 Eastwich Drive. Around 11:30 a.m. that morning, officers conducted surveillance of the residence and observed Donnegan in the backyard. When Donnegan left the residence in his car just minutes later, officers stopped and arrested him on an unrelated warrant. Officers searched Donnegan and found a crack pipe and 1.63 grams of cocaine in his pocket.

Following Donnegan's arrest, officers searched the residence at 910 Eastwich Drive. During the search, officers found 48.97 grams of cocaine in multiple packages inside a "canister safe" underneath the kitchen sink, 2.97 grams of cocaine in a kitchen drawer, .85 grams of cocaine in a leather jacket, .06 grams of cocaine embedded in the carpet, a digital scale and baggies in a kitchen cabinet, marijuana on a counter in the kitchen, and marijuana seeds in an ashtray in the living room. Hill, who was present at the beginning of the search, was arrested. Hill later pled guilty to dealing in cocaine as a Class A felony and was sentenced to thirty years, twenty of which were ordered to be executed.

The State ultimately charged Donnegan with the following: Count I: Possession of Cocaine as a Class B felony; Count II: Dealing in Cocaine as a Class A felony (possession with intent to deliver three or more grams); Count III: Possession of Cocaine as a Class A felony; Count IV: Conspiracy to Deal in Cocaine as a Class A felony; Count V: Possession of Marijuana as a Class A misdemeanor; and Count VI: Possession of Cocaine as a Class B felony. At the jury trial in this case, Hill testified that the lease for 910 Eastwich Drive was in her name only but that Donnegan lived with her about half of the time and helped pay bills; the other half of the time Donnegan lived in Chicago. Hill also testified that Donnegan—whose drug network included at least three or four other individuals—brought large amounts of cocaine from Chicago, oftentimes via public transportation, to sell in Tippecanoe County and that she sold cocaine for Donnegan. Hill testified generally that cocaine was kept in the residence at 910 Eastwich Drive and that both she and Donnegan had access to it. Hill testified specifically that the cocaine found inside the canister safe had been there for approximately one week.

Following trial, the jury found Donnegan guilty as charged. The trial court entered judgment of conviction for Count I: Possession of Cocaine as a Class B felony; Count II: Dealing in Cocaine as a Class A felony; Count V: Possession of Marijuana as a Class A misdemeanor; and Count VI: Possession of Cocaine as a Class B felony. The trial court did not enter judgment of conviction for Counts III and IV. At the sentencing hearing, the trial court identified seven aggravators: (1) criminal history; (2) Donnegan is likely to reoffend; (3) Donnegan committed another crime after he was found guilty in this case; (4) the amount of cocaine involved; (5) Donnegan's treatment of women; (6) Donnegan committed crimes while on bond; and (7) Donnegan is in need of rehabilitative treatment that can best be provided by commitment to a penal facility. The trial court also found two mitigators: (1) Donnegan's family support; and (2) his offer of employment. Concluding that the aggravators outweighed

the mitigators, the trial court sentenced Donnegan as follows: Count I, fourteen years; Count II, forty years; Count V, one year; and Count VI, fourteen years. The trial court ordered Count I to run concurrent with VI but consecutive to the remaining counts, for an aggregate sentence of fifty-five years.

809 N.E.2d at 970–72 (internal footnotes omitted).

On direct appeal, Donnegan raised several issues, including two instances of prosecutorial misconduct, a double jeopardy violation, insufficient evidence to support his conviction, and that his sentence was inappropriate. *See id.* at 972. Regarding his prosecutorial misconduct claims, Donnegan asserted "that the prosecutor committed prosecutorial misconduct during closing argument by broaching the subject of whether one of the State's witnesses, Tammy Tarleton, had taken a polygraph examination when that subject was not addressed with Tarleton during trial." *Id.*

This court agreed that the prosecutor's statement constituted misconduct. Finding, however, that the statement did not put Donnegan in a position of grave peril, this court found no abuse of discretion in denying Donnegan's motion for a mistrial. *See id.* at 973.

Donnegan further asserted that "the prosecutor committed prosecutorial misconduct during closing argument by stating that Donnegan's entire defense was 'smoke and mirrors.'" *Id.* Determining that the prosecutor's statement did not amount to misconduct, this court again found no abuse of discretion in denying Donnegan's motion for mistrial. *Id.* at 974.

Finding a double jeopardy violation, this court reversed Donnegan's convictions for Counts I and VI, possession of cocaine. *Id.* at 975–76. This court also agreed that

the trial court found an improper aggravating circumstance, namely the amount of cocaine involved. *Id.* at 978. This court, however, found the evidence sufficient to support Donnegan's convictions for possession of cocaine with intent to deliver and possession of marijuana, *id.* at 976–77, and that Donnegan's sentence for dealing in cocaine was appropriate. *Id.* at 979.

Pursuant to Indiana Appellate Rule 56(B), Donnegan sought transfer of his case to the Indiana Supreme Court on June 22, 2004. The Indiana Supreme Court denied transfer on August 26, 2004.

On May 19, 2005, Donnegan filed, pro se, a petition for post-conviction relief under cause number 79D02–0505–PC–009 ("Cause No. 9"). Donnegan asserted that the prosecutor committed prosecutorial misconduct by "suppress[ing] favorable material evidence...." (App.20).

Donnegan submitted as an exhibit a letter, dated April 13, 2003, from Hill to Donnegan. In the letter, Hill claimed that "if [she] did not agree to testify [against Donnegan,] the prosecutors made it clear that [she] would get more time." (App.49). The letter also stated that Hill "was willing to say anything and do anything they wanted [her] to because they told [her] that if [she] did they would consider modifying [her] out...." (App.51). Donnegan also submitted an affidavit, dated May 1, 2007, in which Hill averred to the following: "That, minutes before [Donnegan's] [t]rial, I was approached by the State and offered a plea agreement in exchange for testimony against [Donnegan] wherein in so many words the prosecutors informed me that I would be modified which I was." (App.54).

Donnegan further submitted as an exhibit a letter, dated June 20, 2003, from Deputy Prosecuting Attorney Michael Dowler to Brittany (Allen) Cox, a witness

who testified against Donnegan during his trial. The letter reads, in pertinent part, as follows: "[B]ased on your recent cooperation, it would be appropriate to allow you to request the Court for a modification of your sentence.... I will respond to the Court that the State has no objection to the Court considering your petition for modification." (App.53).

Donnegan also asserted, in pertinent part, that he received ineffective assistance of appellate counsel for "fail[ing] to ask the Supreme Court, on transfer, to reconsider [Donnegan]'s properly preserved sentencing issue in light of the U.S. Supreme Court's decision in *Blakely v. Washington.*" (App.37).

On June 9, 2006, Donnegan filed, by counsel, a second petition for post-conviction relief under cause number 79D02–0606–PC–00011. This petition for post-conviction relief was consolidated with the first under Cause No. 9.

In his June 9 petition for post-conviction relief, Donnegan asserted that the trial court improperly found aggravating circumstances, which were neither admitted by Donnegan nor found by a jury, and that his appellate counsel was deficient for failing to raise a claim under *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), *reh'g denied,* by "fil[ing] an Amended Petition to Transfer to present the *Blakely* claim." (App.60). Donnegan also asserted two instances of prosecutorial misconduct: (1) "failing to disclose, to [Donnegan], favorable evidence that was material to the issue of guilt" (App.58); and (2) "allowing state witnesses to testify falsely during trial...." (App.59).

The post-conviction court held an evidentiary hearing on September 10, 2007. On October 22, 2007, the post-conviction court entered its findings of fact and conclusions of law, denying Donnegan's petition for post-conviction relief.

Additional facts will be provided as necessary.

## DECISION

 The purpose of a post-conviction proceeding is to give a petitioner the limited opportunity to raise issues that were unavailable or unknown at trial and on direct appeal. *Allen v. State,* 791 N.E.2d 748, 752 (Ind.Ct.App.2003), *trans. denied.* "Such proceedings are not 'super appeals' through which convicted persons can raise issues that they failed to raise at trial or on direct appeal." *Id.* "In post-conviction proceedings, complaints that something went awry at trial are generally cognizable only when they show deprivation of the right to effective counsel or issues demonstrably unavailable at the time of trial or direct appeal." *Sanders v. State,* 765 N.E.2d 591, 592 (Ind.2002).

 A post-conviction petitioner bears the burden of establishing his claims by a preponderance of the evidence. *Thompson v. State,* 796 N.E.2d 834, 838 (Ind.Ct.App.2003), *trans. denied;* Ind. Post–Conviction Rule 1(5). When reviewing the denial of a petition for post-conviction relief, we will neither reweigh the evidence nor judge the credibility of the witness. *Id.* Thus, to prevail on appeal from the denial of post-conviction relief, the petitioner must show that the evidence as a whole leads unerringly and unmistakably to a conclusion opposite to that reached by the post-conviction court. *Id.* We will disturb the post-conviction court's decision only if the evidence is without conflict and leads to but one conclusion and the post-conviction court has reached the opposite conclusion. *Id.*

### 1. *Blakely v. Washington*

▊▊ Donnegan asserts that the post-conviction court erred by denying him relief on his ineffective assistance of appellate counsel claim. The Sixth Amendment entitles a criminal defendant to the effective assistance of counsel not only at trial, but also during his first appeal as of right. *Seeley v. State,* 782 N.E.2d 1052, 1059 (Ind.Ct.App.2003). Our Supreme Court has recognized three categories of alleged appellate counsel ineffectiveness: (1) denying access to an appeal; (2) failing to raise issues; and (3) failing to present issues competently. *See Timberlake v. State,* 753 N.E.2d 591, 603 (Ind.2001). Donnegan's claim of ineffective assistance of counsel is based on the second category.

▊▊ When reviewing a claim of ineffective assistance of appellate counsel regarding the selection and presentation of issues, the defendant must overcome the strongest presumption of adequate assistance. *Seeley,* 782 N.E.2d at 1059. In determining whether appellate counsel's performance was deficient, we consider the information available in the trial record or otherwise known to appellate counsel. *Id.* The role of appellate counsel should not be measured by information unknown to appellate counsel but later developed after the appeal by post-conviction counsel. *Id.* To prevail upon the claim of ineffective assistance of appellate counsel, the petitioner must show from the information available in the trial record or otherwise known to appellate counsel that appellate counsel failed to present a significant and obvious issue and that this failure cannot be explained by any reasonable strategy. *Id.*

In his petition for post-conviction relief, Donnegan argued that his appellate counsel was ineffective for failing to file an amended petition for transfer to the Indiana Supreme Court subsequent to the United States Supreme Court's decision in *Blakely.* Finding that "[t]he state of the law in Indiana with respect to the holding in Blakely was unsettled at the time of [Donnegan]'s appeal," (App.12), the post-conviction court concluded as follows:

> appellate counsel was not ineffective, since at the time of [Donnegan]'s appeal, the law was unsettled and counsel had been diligent in pursuing a timely appeal and succeeded in receiving a significant sentence reduction for [Donnegan]. Counsel was not ineffective for failing to raise a *Blakely* claim or failing to predict *Smylie.*

(App.17–18).

In this case, Donnegan's appellate counsel filed the appellant's brief on October 14, 2003. Donnegan's counsel, however, did not argue error based on aggravating circumstances that were not found by a jury and proven beyond reasonable doubt, pursuant to Indiana's then-sentencing scheme.

This court issued its opinion on June 14, 2004. Donnegan's appellate counsel filed a petition to transfer on June 22, 2004, which was transmitted to the Indiana Supreme Court on August 2, 2004. On June 24, 2004, the United States Supreme Court decided *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), which required the existence of aggravating circumstances—other than prior convictions—to be found by a jury beyond a reasonable doubt or admitted to by the defendant. Indiana's Supreme Court denied Donnegan's petition to transfer on August 26, 2004.

In *Smylie v. State,* 823 N.E.2d 679 (Ind. 2005), *cert. denied,* 546 U.S. 976, 126 S.Ct. 545, 163 L.Ed.2d 459 (2005), our Supreme Court determined that defendants, whose cases are appealed and who later add a *Blakely* claim by amendment or on petition

to transfer, "adequately present[ ] the issue of the constitutionality of their sentence under *Blakely.*" 823 N.E.2d at 690. When Donnegan filed his transfer to petition, however, the general rule was that an issue could not be raised for the first time in a petition to transfer. *See Bunch v. State,* 778 N.E.2d 1285, 1290 n. 3 (Ind. 2002) (affirming that an issue not raised in the appellant's principal brief is waived); *Paramo v. Edwards,* 563 N.E.2d 595, 600 (Ind.1990) (finding that the defendants waived an issue raised for the first time in their brief in support of petition to transfer). Furthermore, in *Carson v. State,* 813 N.E.2d 1187, 1188–89 (Ind.Ct.App.2004), decided August 20, 2004, this court determined that Carson waived review of any argument under *Blakely,* where Carson raised the issue for the first time in his petition for rehearing.

 "[O]nly the precedent available to appellate counsel at the time of the direct appeal is relevant to our determination of whether counsel was ineffective." *McCurry v. State,* 718 N.E.2d 1201, 1206 (Ind.Ct. App.1999), *trans. denied.* We therefore cannot say that Donnegan's appellate counsel was ineffective for failing to file an amended petition to transfer in order to raise a new issue.

Moreover, given that *Smylie* was not decided until March 9, 2005, well after our Supreme Court denied Donnegan's petition to transfer, we cannot say that Donnegan received ineffective assistance of ap-

pellate counsel, where counsel failed to anticipate a change in the rules governing issues raised for the first time in a petition to transfer.[1] *See Trueblood v. State,* 715 N.E.2d 1242, 1258 (Ind.1999) ("[A]ppellate counsel cannot be held ineffective for failing to anticipate or effectuate a change in the existing law."), *cert. denied,* 531 U.S. 858, 121 S.Ct. 143, 148 L.Ed.2d 94 (2000). Therefore, the post-conviction court's denial of Donnegan's claim of ineffective assistance of appellate counsel is not clearly erroneous.

### 2. *Prosecutorial Misconduct*

 Donnegan asserts that the post-conviction court erroneously denied his petition because the prosecutor committed misconduct by failing to disclose that it entered into "at least a tacit agreement" with Cox and co-defendant Hill in exchange for their testimony. Donnegan's Br. at 22. Specifically, Donnegan contends that "although they had denied the existence of any promises of sentence modification when they testified at trial, [Hill and Cox] had in fact spoken with the deputy prosecutor about that shortly before testifying and were doing so in hopes of being rewarded with modifications for testifying...." Donnegan's Br. at 19.

A claim of prosecutorial misconduct requires a determination that there was misconduct by the prosecutor and that the misconduct, under all of the circum-

---

1. In addition, we find no ineffective assistance of appellate counsel for failure to raise a claim under *Blakely* as it was not settled law until the *Smylie* decision that *Blakely's* application to Indiana's sentencing scheme was clarified. *See Smylie,* 823 N.E.2d at 681–82 (holding that "portions of Indiana's sentencing scheme violate the Sixth Amendment's right to trial by jury, and that the new rule of Blakely should apply to all cases pending on direct review at the time Blakely was announced in which the appellant has adequate-

ly preserved appellate review of the sentence."). Again, we cannot fault Donnegan's appellate counsel for failing to anticipate *Blakely's* affect on Indiana sentences. *See id.* at 689 ("Because *Blakely* represents a new rule that was sufficiently novel that it would not have been generally predicted, much less envisioned to invalidate Indiana's sentencing structure, requiring a defendant or counsel to have prognosticated the outcome of Blakely or of today's decision would be unjust.").

stances, placed the defendant in a position of grave peril to which he should not have been subjected. The gravity of peril is measured not by the degree of the misconduct but by the probable persuasive effect on the jury's decision.

*Hyppolite v. State,* 774 N.E.2d 584, 599 (Ind.Ct.App.2002).

Our supreme court has acknowledged the importance of fully disclosing to the jury any beneficial agreement between a felon-witness and the State, even in cases where those agreements are not reduced to writing. *Seketa v. State,* 817 N.E.2d 690, 693 (Ind.Ct.App.2004).

[O]ur supreme court has also held that the duty to disclose arises when there is a confirmed promise of leniency in exchange for testimony and that preliminary discussions are not matters which are subject to mandatory disclosure. An express agreement requiring disclosure does not exist if a witness testifies favorably in the hope of leniency, and the State neither confirms nor denies leniency to the witness.

*Id.* at 694.

Following her arrest, Hill entered into a plea agreement with the State on August 14, 2001. Hill agreed to plead guilty to dealing in cocaine, as a class A felony, and corrupt business influence, as a class C felony, in exchange for which the State agreed to dismiss the remaining charges. The plea agreement further provided as follows:

2. [Hill] shall receive concurrent sentences, with an executed sentence imposed of twenty (20) years, and any sentence imposed in excess of twenty (20) years shall be suspended upon such terms and conditions of probation as this Court deems appropriate after hearing any evidence or argument of counsel. Further, the State of Indiana agrees to dismiss all charges now pending in the following causes of action: 79E01–0012–CM407, 79D06–0101–CM–77, 79–D06–0103–CM–318; and agrees not to seek to revoke the defendant's probation as a result of the instant offenses in the following causes of action: 79E02–0008–CM–3060, 79E02–0009–CM–3270, and 79E02–0004–CM–1319.

* * *

5. That, prior to sentencing, the defendant will give a sworn, recorded statement relating fully her knowledge of criminal activity in which he [sic] was not involved regardless of the place it occurred and regarding the instance offense and any non-violent offenses that she may have committed in or relating to this county, the defendant will not be prosecuted for any non-violent offenses to which she admits in the statement, and the statement may be entered into evidence in the sentencing hearing.

(Ex. A at 236–37).

On September 11, 2001, as a condition of her plea agreement, Hill provided a "clean-up statement," which is a statement by a defendant that implicates other persons. In her "clean-up statement," Hill implicated Donnegan, stating that Donnegan would get cocaine from Chicago to sell. Hill provided other details, including the names of people involved in Donnegan's drug network and how the drugs were sold or exchanged.

Donnegan's jury trial commenced on March 11, 2003. Hill testified extensively regarding Donnegan's drug network. On cross-examination, Hill also testified as follows:

Q Miss Hill, you signed a plea agreement on September 25th 2001, is that correct?

A Yes.

Q And you—one of the charges you pled guilty was dealing cocaine as a Class A felony?

A Yes.

Q And what was your understanding of the range of penalties for that offense?

A Twenty to fifty years.

Q Okay. And your sentence was—and a part of your plea agreement was that they would cap your sentence at no more than twenty years executed, is that right?

A Yes.

Q Is that what you got?

A Yeah. Well I got thirty years all together, twenty do ten in prison and ten years probation.

Q So you got ten years probation on top of the twenty executed?

A Yes.

Q Okay. You also had several other cases dismissed, did you not?

A Yes.

Q And there were petitions to revoke that were also dismissed, is that correct?

A Yes.

* * *

Q Miss Hill, is it accurate that at some point in time while you've been in the women's prison you filed a motion to modify your sentence, did you not?

A Yes.

Q And tell the jury basically what you wanted the court to do.

A I wanted to go on house arrest or release.

Q You wanted out of jail?

A Yes.

Q And did the court issue an order in response to your motion to modify?

A Yes.

* * *

Q This order denied your motion to modify, did it not?

A Yes.

Q Does it not also indicate that the court is without jurisdiction to modify the defendant's sentence without approval from the prosecuting attorney?

A Yes.

Q And presently that is your understanding, is it not—

A Yes.

Q —that you can't get out of jail unless the prosecutor agrees?

A Right.

(Ex. A at 232–38).

On re-direct, Hill testified as follows:

Q Has the prosecutor agreed to modify your sentence in any way?

A No.

Q Anybody promised you that they would modify your sentence?

A No.

Q Anybody promised to modify your sentence if you testified here for us today?

A No.

(Ex. A at 248–49). On re-cross, Hill admitted that she "hope[d] though ... the prosecutor [would] cut [her] some slack and modify [her] sentence" after testifying. *Id.* at 250.

Cox testified that she arranged for Donnegan to sell crack cocaine to a friend in the summer of 2000. Cox further testified that she had pled guilty to armed robbery in May of 2001 pursuant to a plea agreement, which provided that the executed portion of her sentence would be "capped

at ten (10) years." (Ex. A at 206). The plea agreement further provided that

> prior to sentencing, [Cox] will give a sworn, recorded statement relating fully her knowledge of criminal activity in which she was not involved regardless of the place it occurred and regarding the instant offense and any non-violent offenses that she may have committed in or relating to this county....

*Id.* Cox testified that she gave a "clean-up statement" on or about June 14, 2001, implicating Donnegan in drug activity.

During cross-examination, Cox also testified as follows:

Q [Y]ou are attempting to get your sentence modified, are you not?

A Yeah.

* * *

Q And did you file your own or did you have filed ... a motion to modify your sentence here in the last few months or so?

A I haven't filed it. Yeah, I'm in the process.

Q Well on April 5th of 2002 did you file a petition for shock probation?

A Correct.

Q Okay. And that is a request that basically I've seen enough jail, I want out now, one of those motions?

A Yeah.

Q That was denied, was it not?

A Correct.

Q And were you informed by anybody that a modification of sentence cannot occur at this point without the agreement of the prosecuting attorney?

A Right.

* * *

Q So unless the prosecutor agrees, you've got to serve your entire sentence?

A Correct.

(Ex. A at 205–208).

On re-direct examination, Cox presented the following testimony:

Q Now has the prosecutor agreed to any sort of modification?

A No.

Q Has the prosecutor indicated to you that if you tell us what we want to hear we'll agree to one?

A No.

Q Are you here testifying because you want a modification?

A No.

Q Have you said what you've said today to get a modification?

A No.

Q Why are you testifying here today?

A Well truthfully I really didn't want to come and do this but like I said I feel like I'm being pushed in it because it's in my plea agreement and we had this discussion too down at the jail yesterday. I have to do it or I'm gonna lose time. I could do my probation time.

Q You and I met for about an hour and a half yesterday?

A Right.

Q It's the first time we've ever met?

A Right.

Q Is it fair to say for about the first forty-five minutes you wouldn't talk to me at all, would you?

A Correct.

Q Did I make any sort of promises to get you to talk?

A No.

*Id.* at 209–210.

On re-cross examination, Cox testified that she believed that if she did not testify against Donnegan that the State would file a petition to revoke her probation. On redirect examination, Cox admitted that she was not testifying in "fear of doing that extra year in jail...." *Id.* at 212. Cox further testified that she could not "come back here for modification, they keep denying [her] modification[.]" *Id.*

During the post-conviction hearing, Hill testified that during Donnegan's trial, she lied about the cocaine belonging Donnegan in return for her plea agreement. Hill claimed that the prosecutor threatened to take her "plea agreement away if [she] did not testify...." (Tr. 43). Hill, however, acknowledged that she entered into her plea agreement two years prior to Donnegan's trial. Hill further testified that she lied in her clean-up statement.

Hill also testified that "right before [Donnegan]'s trial," she and Cox were waiting to testify when Cox asked the prosecutor whether she would receive a modified sentence in exchange for her testimony against Donnegan. (Tr. 38). According to Hill's testimony, the prosecutor "in a round about way, he couldn't say on the record because that would be bribing a witness. He said, yes, he would...." (Tr. 38–39). Hill testified that she then asked the prosecutor whether the sentence modification applied to her, and "[h]e said in a round about way, yes." (Tr. 40). Hill testified that she served a total of "four and a half years" of her sentence. (Tr. 41).

Hill filed a petition for modification of her sentence on or about May 22, 2003. The post-conviction court admitted into evidence a letter from Hill to Deputy Prosecutor Dowler. The letter reads, in relevant part as follows:

> I am writing you in concern with my modification. I have recently testified on the State's behalf against my three co-defendants: Harold Donnegan, Kenneth Ivy and Shannon Munn. The last time we spoke was during Harold Donnegan's trial. You told me that the next time I file for modification to write you a letter and explain why I feel that I should be modified. *I also understand that there are no guarantees.* The only thing I ask is for you to please read over my modification, and then make your decision.
>
> ... Enclosed is a copy of my modification.... Please take a few minutes out of your schedule to look over my modification, then make your decision.

(State's Ex. 3) (emphasis added).

The post-conviction court also admitted into evidence a second letter, postmarked July 22, 2003, from Hill to Deputy Prosecutor Dowler. The letter reads, in pertinent part, as follows:

> I am writing you in concern of my new court date that was re-scheduled for July 25th. The reason I am writing you is because the court date is for a status conference for my modification.... My question is if you will be present during this time to speak on my behalf for the recent cooperation of three trials of: Harold Donnegan, Jr., Shannon Munn, and Kenneth Ivy?
>
> ... Although my conduct report is very good, and I have changed extremely since I've been here, I could still use your help with this matter. *I know that there are no guarantees,* but I have my full cooperation on all three of these trials....

(State's Ex. 2) (emphasis added).

Hill testified that by stating "there are no guarantees," she meant "there's nothing on paper saying from the prosecutor

that he was gonna modify [her], but like [she] said there was verbal." (Tr. 67).

Cox also testified during the post-conviction hearing. Cox testified that prior to Donnegan's trial, she approached the prosecutor and spoke "briefly" about modifying her sentence. (Tr. 75). According to Cox, the prosecutor "never like offered [her] a deal, but he told [her] to submit a modification and that he would help ... but he didn't say, well, if you testify against Harold Donnegan then I will modify you." (Tr. 75). Cox testified that she did not recall whether the prosecutor also spoke with Hill.

Cox further testified that she "believe[d]" the prosecutor "would help [her] to put a good word in if [she] tried to modify." (Tr. 77). Cox, however, did not "believe that [she] had a deal because that was never like said that [she] had a deal," but the prosecutor told her that if she filed a petition for modification of her sentence, "maybe they would put a word in that [she] did testify in [Donnegan's] case." (Tr. 78–79). Cox reiterated that she did "not really" think there was a deal between her and the prosecutor (Tr. 82); and in fact, agreed there was no agreement between her and the State that she "would get something in exchange for [her] testimony...." (Tr. 83). Finally, Cox testified that her testimony during Donnegan's trial was true.

The post-conviction court found as follows:

5. Hill was called as a State's witness at [Donnegan]'s jury trial, as was [Cox]. Both Hill and Cox were serving executed sentences in the Indiana Department of Correction prior to trial. Both had previously filed petitions to modify their sentences, and had said petitions denied.

6. Immediately prior to testifying, both Hill and Cox met jointly with trial deputy Michael Dowler. Neither woman met with Dowler or his investigators or discussed their testimony with the State prior to that occasion.

7. In the brief period immediately prior to testimony, Cox and Hill requested sentence modifications in return for their cooperation, but Dowler made no promises of any consideration. He did instruct both women they might subsequently submit petitions to modify and should document their cooperation with the State, but that he would not guarantee any benefit either would receive. Cox explicitly stated at the post-conviction hearing that no delay was struck between the State and Cox or Hill, and that she understood this to be the case at the time.

8. Neither Cox nor Hill was encouraged to present false testimony on behalf of the State.

* * *

10. Under cross-examination at trial ..., both Cox and Hill specifically and emphatically denied on the stand that they had been promised any deals in exchange for their trial testimony.... The Court finds that this testimony was credible, and that there was no deal with the State.

* * *

14. Two letters submitted by Hill to the State, and entered into evidence at the post-conviction hearing, show that Hill understood there was no guarantee of a deal with the State, as she stated to the Deputy Prosecutor. Hill's letters to the State ... show that Hill hoped for a modification of her sentence, but that no guarantees had been made.

15. Unlike Hill, Cox has not recanted or claimed that her testimony at [Donnegan]'s trial was either leveraged or un-

true.... Cox also disputed that there was any conversation in her and Hill's joint meeting with the deputy prosecutor regarding offering false testimony at trial.

16. The testimony of Hill and Cox entered at [Donnegan]'s trial was credible, and was sufficient evidence to support the jury finding [Donnegan] guilty. The record at trial shows other witness testimony about dealing and possession of cocaine by [Donnegan], in addition to the two witnesses above, and [Donnegan] has not alleged that any other testimony offered against him was perjurious or tainted by deal-making or promises of consideration.

\* \* \*

18. Because this Court finds the testimony offered at trial by Hill and Cox was truthful and not obtained by means of an undisclosed agreement, the Court holds as a matter of fact and law that there was no prosecutorial misconduct as alleged by [Donnegan].

(App.6–10). The post-conviction court then concluded that, in this case, "there was no express agreement requiring disclosure, as neither Hill nor Cox believed at the time that a modification was guaranteed in return for their testimony." (App.13).

■ "[E]xpress plea agreements or understandings between the State and witnesses, even in cases where those agreements are not reduced to writing," must be fully disclosed. *Sigler v. State,* 700 N.E.2d 809, 811–12 (Ind.Ct.App.1998), *trans. denied.*

An express agreement exists where there is a confirmed promise of leniency in exchange for that witness' testimony. On the other hand, preliminary discussions need not be disclosed nor is disclosure required where in fact the witness hopes for leniency but the State neither confirms nor denies that hope to the witness.

*Id.* at 812. "Similarly, hopes and expectations of a state witness coupled with evidence that a prosecutor-accomplice/witness deal may have been consummated after the in-court testimony is insufficient" to require disclosure. *Wright v. State,* 690 N.E.2d 1098, 1113 (Ind.1997).

Here, we cannot say that "the evidence as a whole leads unerringly and unmistakably" to a conclusion that there was an express agreement between the State and either Cox or Hill. *See Thompson,* 796 N.E.2d at 838. Rather, the evidence shows that in May and August of 2001, respectively, Cox and Hill entered into plea agreements with the State. The plea agreements, however, did not provide for or promise sentence modification in exchange for their testimony against Donnegan.

Approximately two years later, and shortly before Donnegan's trial, Hill and Cox asked the prosecutor whether they could receive a sentence modification in exchange for their cooperation. The prosecutor informed Hill and Cox that they could apply for a sentence modification but he made no promises that they would receive a modification.

In her subsequent letters to the prosecutor, Hill recognized that the prosecutor did not guarantee a sentence modification. Hill also testified during Donnegan's trial that she merely *"hope[d]* ... the prosecutor [would] cut [her] some slack and modify [her] sentence" after testifying. *Id.* at 250 (emphasis added). Cox testified she did not believe the prosecutor offered a deal to modify her sentence in exchange for her testimony.

Given that the State did not enter into an express agreement with Hill or Cox to modify their sentences in return for their

cooperation, we find no prosecutorial misconduct in failing to disclose such as argued by Donnegan.[2] Accordingly, we find no reversible error.

Affirmed.

NAJAM, J., and BROWN, J., concur.

---

**2.** We note that Donnegan acknowledges Cox and Hill testified only *"in hopes* of being rewarded with modifications for testify-

ing...." Donnegan's Br. at 19. Thus, it is clear that there was no express agreement.